Walter L. ALEXANDER, Jr., Ronald E. Lee, Jr., Individually and as Independent Executor of the Estate of Katherine P. Barnhart, Leonora Kerr Baldwin, Individually and as Trustee of the Kerr Voting Trust, Gardner Baldwin, Daphne Kerr Loft, Individually and as Independent Executrix of the Estate of Peter S. Loft, Kyra Kerr Lucchesi, Randa Kerr Davis, Virginia A. Winship, Helen Clifton, Carolyn Young, Elva J. Johnson, Trustee of the Johnson Foundation, Willard W. Shuart, Jack S. Josey, Individually and as Trustee of the Josey Foundation, Lenoir M. Josey II and Robert A. Josey II, Appellants,

v.

John D. STURKIE, Lloyd O. Sturkie, Craig A. Knight, Individually, and as General Partner of the CAK Family Partnership, Ltd., the CAK Family Partnership, Ltd., Judith Sturkie Knight and Quality Electric Steel Castings, Inc., Appellees.

No. 14-94-00312-CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 14, 1995.

Rehearing Overruled Oct. 19, 1995.

Paul S. Francis, Richard Yount, Jr., Houston, for appellants.

Russell B. Starbird, Theodore F. Weiss, Jr., Houston, for appellees.

Before YATES, FOWLER and O'NEILL, JJ.

## OPINION

O'NEILL, Justice.

This is an appeal from a summary judgment in favor of appellees in a shareholders' derivative suit. Because material fact issues exist regarding the existence of a corporate opportunity, we reverse and remand.

### I. THE ISSUE

The dispute in this case arises out of a series of stock purchases by which appellee, John D. Sturkie ("Sturkie"), gained a controlling interest in Quality Electric Steel Castings, Inc. ("Quality"). The petition alleges that appellees wrongfully acquired company stock by (i) diverting corporate funds and assets to fund the acquisition, (ii) fraudulently promising to adhere to and then breaching an agreement not to acquire any stock of the corporation while corporate reorganization discussions were ongoing, and (iii) wrongfully usurping a corporate opportunity to acquire the stock. Appellees were granted a partial summary judgment on the corporate opportunity claim. The summary judgment was severed from the main action and forms the basis of this appeal.

Appellants complain at the outset about the form of the trial court's order granting summary judgment. The order provides: "... defendants' motion for partial summary judgment is granted, and all of plaintiff's claims and causes of action based upon the purchase of shares of [Quality] stock by defendants are hereby dismissed with prejudice to refiling." Appellants believe that the order is overboard because it could be construed to encompass appellees' other claims regarding diversion of corporate funds and

breach of the alleged standstill agreement. The parties agree, however, that these other claims were not the subject of the summary judgment motion and therefore were not before the trial court. In an appeal from a summary judgment, issues to be reviewed by the appellate court must have been actually presented to and considered by the trial court. *Travis v. City of Mesquite,* 830 S.W.2d 94, 100 (Tex.1992). Because appellants' claims regarding diversion of corporate funds and breach of the standstill agreement were not before the trial court, the partial summary judgment could only dispose of appellants' claim that Sturkie's acquisition of stock took advantage of an opportunity that belonged to the corporation. Therefore, only the corporate opportunity claim is presented for review.

## II. THE STANDARD OF REVIEW

The standard to be followed in reviewing a summary judgment is well established. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Summary judgment is intended to eliminate only patently unmeritorious claims. *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989). In deciding whether or not there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in his favor. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex. 1984); *Karl v. Oaks Minor Emergency Clinic,* 826 S.W.2d 791, 794 (Tex.App.—Houston [14th Dist.] 1992, writ denied). Evidence favoring the moving party is not considered unless it is uncontroverted. *Great American Reserve Ins. Company v. San Antonio Supply Company,* 391 S.W.2d 41, 47 (Tex.1965). We are required on this appeal to accept as true the version of the facts provided by the appellants, against whom summary judgment was rendered.

## III. THE FACTS

Quality was founded and incorporated under the laws of Texas in 1948. It was originally organized by Lloyd O. Sturkie and other investors to purchase the foundry equipment of Hughes Tool Company. Quality operates a full service steel foundry. Over the years the members of the company's board of directors has varied, but during times material hereto included Lloyd O. Sturkie, his son John D. Sturkie, John's brother-in-law Craig A. Knight, two Quality employees Douglas L. Robertson and Melvin M. Powell, and three outside directors, appellants Walter Lane Alexander, Jr., Ronald E. Lee, Jr. and Leonora Kerr Baldwin.

According to appellants, during a board meeting in July, 1988, John D. Sturkie, as President, announced to the board that Quality should consider a significant reorganization. Sturkie initiated a series of discussions at the board level about a number of proposals, including the creation of an employee stock ownership plan ("ESOP") by which the company would acquire and hold stock for the benefit of its employees. Sturkie also discussed reducing the number of shareholders so that Quality could qualify as a Subchapter S corporation and thereby avoid corporate income taxes. Several months later, Sturkie added a merger proposal to the discussions under which a new corporation would be formed to buy stock using Quality funds. The new company would then be merged with Quality. Appellants testified that these discussions with Sturkie continued actively for over a year, through at least July 14, 1989.

To evidence the continuing nature of these discussions, appellants attached to their response to the summary judgment motion various documents prepared at the request of appellees. One was a stock valuation study from First Southwest Company, obtained by Sturkie and provided to the directors in connection with the proposals presented to the board. A second valuation study was obtained by Sturkie at company expense from J. Nile Brennecke & Associates. The Brennecke report stated its purpose as follows:

*PURPOSE*

J. Nile Brennecke & Associates, Inc. ("JNBA") was retained by Mr. John D. Sturkie, *President*, to determine a fair market value of Quality Electric Steel Castings, Inc. ("Quality Electric" or the "Company"). Since the Company's founding, its shares had become widely held. Because the Company was not publicly traded, it was difficult for stockholders desiring to sell their shares to find buyers. Additionally, management was desirous of increasing their ownership interest in the Company. *Consequently, the Company was planning to make a fair offer to repurchase all shares tendered by any stockholders desiring to sell. This valuation was to determine a fair market value to be offered by the Company to its stockholders.* Management was of the opinion that up to 80% of the Company's outstanding shares might be tendered. *In order to facilitate the repurchase offer, First Southwest Company had been retained as investment banker to assist in obtaining the funds necessary to finance the stock redemption and buyout.*

(emphasis added).

In the fall of 1988, Quality's counsel, Vinson & Elkins, prepared a specific proposal which stated that "Quality will offer to purchase 721,481 shares of its common stock from shareholders not a part of the Sturkie group ("Outside Shareholders") for $6.00 per share...." This proposal was circulated to the directors. During this same time the appellant directors, with the approval of Sturkie, engaged an attorney, John Rhem, and a corporate valuation expert, Niven & Associates, to advise them with respect to the various proposals being discussed. Rhem met with Sturkie regarding reorganization matters, and his fees were paid by Quality. Also in the fall of 1988, appellants allege that Sturkie entered into a specific agreement with two of the outside directors not to engage in any stock solicitation or acquisition activities while the corporate re-

organization proposals were being discussed. The alleged standstill agreement was later confirmed by Sturkie in a second meeting, and again reconfirmed as late as July 14, 1989.

In connection with the merger proposal, advanced in early 1989, the discussion focused on the price at which the stock should be purchased. In mid-July, 1989, Sturkie promised to "get back to" the appellant directors on a proposed price proposal, although he never did. Instead, appellants learned that the Sturkie group, without disclosure to the board, had been actively engaged in the acquisition of stock for their own account, and ultimately acquired a controlling interest in Quality.[1]

## IV. DISCUSSION

 A violation of the corporate opportunity doctrine occurs when an officer or director misappropriates a business opportunity that properly belongs to the corporation. *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576–78 (Tex.1963). It arises where a corporation has a legitimate interest or expectancy in, and the financial resources to take advantage of, a particular business opportunity. *Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.*, 779 S.W.2d 474, 477 (Tex.App.—El Paso 1989, writ denied). Appellees contend that (A) Quality had no corporate interest in the stock acquisition, (B) Quality did not have the financial resources to take advantage of such an opportunity, and (C) no evidence was presented by appellants in their response to the *motion for summary judgment.*

### A. Corporate Interest

At what point an officer or director of a corporation takes advantage of a corporate opportunity by purchasing the corporation's stock is a question of first impression in Texas. Appellees urge this court to adopt a "bright line test" that would require a formal board resolution, or written corporate policy, before a corporate opportunity to purchase

---

**1.** Appellants devote a significant portion of their brief to the manner in which the appellees allegedly funded their acquisition of stock by "illegally" increasing Sturkie's compensation. However, because our sole inquiry on appeal is the existence of a corporate opportunity, we do not address or consider these allegations.

stock is found to exist. Appellants urge the adoption of a less restrictive standard. The fundamental issue concerns the extent of the "corporate interest" that a fiduciary must serve unselfishly when purchasing stock in the corporation.

■ We start with the general proposition that, ordinarily, a corporation has no special interest in the opportunity to purchase its own shares, and a director violates no duty to the corporation by dealing in its stock for his own account. *3 Fletcher Cyclopedia of the Law of Private Corporations*, Sec. 862, p. 303 (perm. ed. 1986). This is because "a corporation, as such, has no interest in its outstanding stock or in dealings therein by its officers, directors or shareholders. If there is a struggle for control the corporation would normally occupy a neutral position."[2] *Faraclas v. City Vending Co.*, 232 Md. 457, 464, 194 A.2d 298, 301 (1963); *see also Zidell v. Zidell, Inc.*, 277 Or. 423, 429, 560 P.2d 1091, 1095 (1977) (holding shareholders who bought corporate shares at bargain price did not usurp corporate opportunity); *Katz Corp. v. T.H. Canty & Co.*, 168 Conn. 201, 209–210, 362 A.2d 975, 979–80 (1975) (holding allegations that officers and directors bought corporate shares at bargain price insufficient to establish usurpation of corporate opportunity); *Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 122–23, 412 P.2d 47, 57–58 (1966) (holding corporation president who borrowed money from corporation to purchase corporate shares did not usurp corporate opportunity).

■ However, if the corporation has an interest in the stock, the opportunity to acquire the stock belongs to the corporation. *See, e.g., PJ Acquisition Corp. v. Skoglund*, 453 N.W.2d 1, 9 (Minn.1990); *Vulcanized Rubber & Plastics Co. v. Scheckter*, 400 Pa. 405, 414, 162 A.2d 400, 406 (1960). Whether or not a corporate interest exists depends upon the facts and circumstances of the par-

ticular case. *See, e.g., Sladen v. Rowse*, 115 R.I. 440, 347 A.2d 409, 412 (R.I.1975) (holding question of corporate opportunity "depends in each instance upon the facts and circumstances of the particular case"); *Weiss v. Kay Jewelry Stores, Inc.*, 470 F.2d 1259, 1270 (D.C.1972) (stating that under Delaware law the determination of corporate opportunity "is always one of fact to be determined from the objective facts and surrounding circumstances"). It is only when the undisputed facts show that the opportunity "bears no logical or reasonable relation to the existing or prospective business activities of the corporation" that the opportunity may be considered noncorporate as a matter of law. *PJ Acquisition Corp. v. Skoglund*, 453 N.W.2d at 8, citing *Miller v. Miller*, 301 Minn. 207, 224, 222 N.W.2d 71, 81 (Minn.1974).

■ A review of authorities from other jurisdictions shows that the corporate interest question is generally analyzed in terms of (1) whether the corporation has a corporate policy or practice regarding stock acquisition, or (2) whether the corporation needs the stock or has a clear stated interest in and reason for its acquisition. *PJ Acquisition Corp. v. Skoglund*, 453 N.W.2d at 9 (holding the opportunity is corporate if the corporation needs the stock or has a clear reason for pursuing its acquisition); *Vulcanized Rubber & Plastics Co. v. Scheckter*, 162 A.2d at 406 (stating affirmative action is necessary which will disclose a corporate purpose, reason and program). Appellees emphasize the former line of authority, urging this court to require the establishment of a corporate policy or practice of purchasing shares, or a formal board resolution, before a corporate interest in a company's stock may be found to exist.

Appellees cite several cases in support of their "bright line" position, beginning with *Zidell v. Zidell*, 560 P.2d 1091. In analyzing the corporate interest issue, the Supreme Court of Oregon drew the line "at the point

---

**2.** We agree that in matters of control the corporation should occupy a neutral position. Therefore we do not concern ourselves with the parties' vigorous contentions and diagrams demonstrating who might or might not ultimately be "in control" as a result of the trial court's, or this court's, decision. If a controlling interest were to be exercised in the future in such a manner as

to violate fiduciary duties owed by the majority to the minority shareholders, the minority shareholders could seek equitable redress for such conduct. *See e.g., Davis v. Sheerin*, 754 S.W.2d 375 (Tex.App.—Houston [14th Dist.] 1988, writ denied). Our inquiry is narrowly focused on whether appellants have raised a fact issue regarding the existence of a corporate opportunity.

where a purchase for the director's own account has the effect of thwarting *a declared corporate policy.*" *Id.* at 1093 (emphasis added). Appellees interpret this statement to require a written policy or board resolution before a corporate interest may be found to exist. We do not believe the case must be so rigidly construed. In *Zidell* the plaintiff, a minority shareholder, acknowledged the general rule that a director violates no duty to his corporation by acquiring its stock, but sought to carve out an exception when the stock is that of a closely-held corporation and the purchase is made at a favorable price and for the purpose of affecting control of the company. The plaintiff presented no evidence that the corporation had made a practice of purchasing its own stock or that it had ever contemplated doing so. The court simply refused to infer such an agreement from an empty record or to create an exception to the general rule.

Appellees also rely upon *Vulcanized Rubber & Plastics Co. v. Scheckter,* 162 A.2d 400, in which the Supreme Court of Pennsylvania found that the individual actions of a single director in conceiving of and presenting a proposed plan of corporate repurchase to an individual shareholder, neither expressed nor revealed to the board, was insufficient evidence of a corporate purpose to sustain the granting of injunctive relief against individual purchases of the stock. Although the court stated that a board resolution "will suffice," it did not say that such formal action was necessary to prove an existing corporate interest. Rather, the court held: "[w]hat is necessary is *some affirmative action* by the corporate organization which will disclose *a corporate purpose, reason and program.*" 162 A.2d at 405 (emphasis added). The court found no evidence that the board had ever considered a corporate purchase: "[t]here being no indication in the record that the

board of directors as a body *ever considered* purchasing any stock, there could not be any existing corporate interest therein." *Id.* (emphasis added).

In *Katz v. T.H. Canty & Co., Inc.,* 362 A.2d 975, also cited by appellees, the Supreme Court of Connecticut held that plaintiff had failed to establish a corporate purpose in purchasing its own stock where an "informal agreement" among the directors to defer to the corporation when stock became available was obsolete, many new directors were never informed of that "understanding", and on certain occasions the corporation had refused to buy its own stock. Again, there was no evidence that the directors, as a board, had ever considered a corporate purchase of shares. The court determined that the plaintiff had failed to establish a corporate policy or practice of purchasing its own stock.

From a review of the record it appears that Quality had no policy or practice of acquiring its own stock. Although there was some evidence that at various times over a twenty year period Quality had redeemed a small number of shares from other shareholders, the evidence was not sufficient to justify an inference that it was the practice or policy of the company to redeem its own shares. Nor did the board ever approve a resolution authorizing the corporation to purchase its own shares.[3] However, the inquiry does not necessarily end here. Irrespective of established company practice or formal corporate policy, a corporate opportunity may exist if the company has a clear stated existing interest in and reason for the acquisition of its stock. *See, e.g., PJ Acquisition Corp. v. Skoglund,* 453 N.W.2d at 9. As stated in *Vulcanized Rubber & Plastics Co. v. Scheckter,* 162 A.2d at 406, to create a corporate interest there must be "some affirmative action" by the corporation that will disclose "a corporate purpose, reason and

---

**3.** According to appellants, various feasibility studies and valuations were being prepared and actively reviewed so that the board *could determine* whether to propose a resolution regarding a corporate purchase. Whether or not Quality would have actually resolved to purchase its own shares is immaterial. As stated by the court in *Imperial Group (Texas), Inc. v. Scholnick,* 709 S.W.2d 358, 363 (Tex.App.—Tyler 1986, writ ref'd n.r.e.): "[t]o permit an after-the-fact deter-

mination as to whether Imperial would have purchased the Horsefarm Tracts under the facts before us would abrogate the full disclosure rule.... Scholnick's failure to disclose the opportunity presented by Horsefarm renders the finding of the jury that Imperial 'would not have acquired the tract' immaterial." *Id.* We do not find the absence of a formal board resolution dispositive.

program." Therefore it is necessary to review the facts, in a light most favorable to the appellants, to determine whether there is sufficient evidence to create a fact issue regarding whether or not Quality, during the time that Sturkie was purchasing the shares in issue, had a clear stated existing interest in and reason for the stock acquisition.

Appellants allege that Sturkie presented a series of proposals to the board, each of which involved a corporate acquisition of shares. Appellants testified that the discussions regarding a Quality stock purchase began in July, 1988, and continued actively through at least July 14, 1989. Appellants point to two stock valuation studies presented to the board in connection with the alleged ongoing discussions, one of which states that it was prepared in connection with a proposed Quality purchase of shares. That report further states that an investment banker had been hired to facilitate Quality's purchase. Quality's counsel prepared a proposal referencing a company purchase of stock. With Sturkie's permission, the appellant directors hired an attorney, whose fees were paid by the company. They also hired a valuation expert to advise them about the various proposals. Appellants further allege that in the course of these discussions Sturkie specifically agreed, on a number of occasions, not to acquire company stock. Although appellants' cause of action for breach of the standstill agreement was not before the trial court on motion for summary judgment and is therefore not the subject of this appeal, Sturkie's alleged representations that he would not engage in any stock transactions are some evidence that Quality was actively considering a stock acquisition. These alleged facts form a sufficient basis upon which a factfinder might reasonably conclude that the board was taking affirmative action toward a corporate purchase, and that it had a clear stated existing interest in the acquisition sufficient to give rise to a corporate opportunity at the time Sturkie was engaged in purchasing stock.

Appellants testified that the various corporate acquisition proposals were being considered for the purposes of reducing the number of shareholders in the company, creating a market for the shares and offering an incentive to employees through the establishment of an employee stock ownership plan. Appellees do not contest that these were desired goals under discussion, but argue that a *corporate* purchase was not necessary to achieve them. Although this may be true, it does not negate the existence of a corporate interest. According to appellants, it is a corporate acquisition that was *in fact* being discussed. The goals advanced during the board discussions in the context of a corporate acquisition are sufficient to create a corporate reason or purpose for a Quality purchase of stock.

Appellees argue that anything short of their "bright line" position will conflict with the general law disfavoring restraints on alienation. They contend that a restraint on the sale of stock could conceivably be imposed by a single director suggesting a corporate purchase of stock even though no other director concurs. This would, in turn, unduly restrict the marketability of minority shareholders' stock. Requiring a written policy, appellees argue, will protect the minority shareholders' interests. It is true that restraints on the alienation of stock, or any other property interest, are not favored in the law. However, this general proposition is not relevant to the determination of the existence of a corporate opportunity. The elements of the cause of action focus on the interest of the *corporation*, not the interest of the individual shareholder. If a corporate interest is found to exist, the fact that an officer or director, who has a fiduciary obligation of undivided and unselfish loyalty to the corporation, must refrain from interfering with that interest does not unduly restrain alienation of corporate shares. Presumably the owners of Quality stock acquired their interests knowing that the market for shares in a closely-held corporation is severely limited at best. Moreover, the hypothetical situation posited by .appellees would not be possible absent evidence of clear, concerted and affirmative action on the part of the board.

The case of *Sladen v. Rowse*, 347 A.2d 409, cited by appellants, is analogous to the present dispute. There the Supreme Court of

Rhode Island held that, where the possibility of buying shares was discussed "intermittently" at board meetings and around the company's offices, even though no action was taken because the asking price was too high, an officer and director of the company breached his fiduciary obligations to the corporation by acquiring the stock for his own account without advising anyone that the stock could be purchased for a lower price. Appellees attempt to distinguish the case, claiming that in *Sladen* the corporate officer defendant had been given authority to negotiate for purchase of the shares on the company's behalf. However, whether or not the defendant had been formally authorized by the board to negotiate for a corporate purchase of the shares is not apparent from the opinion. The court's analysis focused instead on objective evidence in the record of *the intent of the company* to acquire the shares. The court held that such intermittent discussions, together with other factors, were sufficient to show that the company had an interest in acquiring the shares.

Reviewing the evidence in a light most favorable to the appellants, we find that a material fact issue exists regarding whether or not Quality had a corporate interest in the stock acquisition.

Although summary judgment was granted on the corporate opportunity claim, the trial court did not specify whether the motion was granted on the corporate interest issue or on the alleged lack of financial resources to take advantage of the opportunity. When a summary judgment does not specify the grounds upon which it was granted, the reviewing court will affirm the judgment if any one of the theories advanced in the motion is meritorious. *State Farm Fire & Casualty Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex.1993). Therefore we must address appellees' claim that Quality could not legally avail itself of the alleged opportunity.

### B. Ability to Undertake the Opportunity

There can be no misappropriation of a corporate opportunity unless the corporation is financially able to take advantage of that opportunity. *Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.*, 779 S.W.2d 474, 477 (Tex.App.—El Paso 1989, writ denied); *Canion v. Texas Cycle Supply, Inc.*, 537 S.W.2d 510, 513 (Tex.Civ.App.—Austin 1976, writ ref'd n.r.e.). The burden of pleading and proving corporate inability is on the officer or director who allegedly appropriated the opportunity. *Huffington v. Upchurch*, 532 S.W.2d 576, 579 (Tex.1976); *Canion*, 537 S.W.2d at 513. Therefore we must determine whether the evidence, when viewed in a light most favorable to appellants, conclusively established the corporation's inability to avail itself of the opportunity to acquire its own stock as a matter of law.

Article 2.38B(2) of the Texas Business Corporation Act precludes the board of directors of a corporation from authorizing distributions of corporate assets where such a distribution would exceed the surplus of the corporation. Under Article 1.02(8)(c), a "distribution" means a transfer of money or other property by a corporation to its shareholders for a purchase or redemption by the corporation of its own shares. Appellees allege that the cost to purchase all shares outside of the Sturkie group at an offering price of at least $6.00 per share would have been $4.2 million or more. Quality had a capital surplus of only $3,538,978 on June 30, 1988, $3,697,405 on June 30, 1989, and $4,100,000 by December 31, 1989. Appellees argue that a purchase by the company during the time period of Sturkie's alleged misconduct, from late 1988 into the fall of 1989, would have required a distribution in excess of its surplus and would have therefore been illegal.

Irrespective of the parties' arguments regarding whether Quality could have financed the proposed purchase, "[t]he validity of the transaction and the authority of the corporation to purchase shares are determined *at the time of purchase*...." *Williams v. Nevelow*, 513 S.W.2d 535, 537 (Tex.1974) (emphasis added). During the period in question, appellants allege that the directors were actively engaged in obtaining and evaluating various reorganization proposals so that the board could decide whether the company should purchase its own shares. The "time of purchase" remained to be seen, and would have been the time set forth in any such

corporate offer or resolution. Moreover, appellees' own summary judgment evidence showed that the corporate surplus had steadily grown over the period of time in dispute, and might have been sufficient by the actual time of purchase. Any such assessment of financial ability is simply premature, and could not support a grant of summary judgment on this ground.

### C. Appellants' Summary Judgment Evidence

Finally, appellees contend that no evidence was presented to controvert their second motion for summary judgment because appellants' response merely incorporated by reference a prior response to appellees' first motion for summary judgment. Appellees, citing *McConnell v. Southside Independent School Dist.*, 858 S.W.2d 337 (Tex.1993), argue that appellants were required to expressly set forth the grounds upon which the summary judgment was contested and could not merely incorporate a prior response. In *McConnell,* the Texas Supreme Court held:

> Issues a non-movant contends avoid the movant's entitlement to summary judgment must be expressly presented by written answer to the motion or by other written response to the motion and are not expressly presented by mere reference to summary judgment evidence.

*McConnell,* 858 S.W.2d at 341. The non-movant must expressly present to the trial court the grounds upon which it seeks to avoid summary judgment. *See City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979).

In this case, appellees not only incorporated their prior response, but independently expressed the *grounds* for their opposition to the second motion for summary judgment. Appellants simply incorporated their original response as *evidence* to support the grounds asserted in the second response. Rule 166a(c)(i) provides that the judgment shall be rendered if "the deposition transcripts, interrogatory answers, and other discovery responses *referenced* or set forth in the motion or response show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."

The grounds for appellants' contest to the motion were expressly presented in the second response. Appellants' response was sufficient to raise a material fact issue regarding the alleged corporate opportunity.

### V. CONCLUSION

Reviewing the evidence in a light most favorable to appellants, we find that a genuine issue of material fact exists on the corporate opportunity claim. We would also like to address one final point. Both parties express concern about the court's intrusion into the corporation's internal affairs. Appellees assert that "[appellants] here seek an order forcing Quality to spend $1.3 million to buy from the Sturkie family the stock which they purchased from [appellants] and other shareholders, thereby taking control from the Sturkie family and handing it to [appellants] without their spending one dime." Appellants argue that "[i]t would not be an unwarranted intrusion into the internal management of the corporation's affairs for the court to restructure Quality Electric's capitalization as requested by the [appellants]." Whether or not the relief sought by appellants would be legally or factually supportable in the event liability is ultimately found is not before this court. It will be up to the trial court to determine the appropriate remedy if it is found that appellees in fact usurped a corporate opportunity.

We reverse the partial summary judgment and remand the case for further proceedings in accordance with this opinion.